# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

|  |  |  |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * | | |
| IBIRONKE AKINTAJU, | * | No. 17-1574V |
|  | * | Special Master Christian J. Moran |
| Petitioner, | * | |
|  | * | Filed: February 9, 2021 |
| v. | * | Reissued: May 27, 2021 |
|  | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | Shoulder injury, onset |
|  | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * * * * * * * | | |

Renee Gentry, George Washington University Legal Clinic, Washington, DC, for petitioner;
Darryl Wishard, United States Dep't of Justice, Washington, DC, for respondent.

## FINDING OF FACT[*]

The parties dispute when Ms. Akintaju's shoulder pain began. The evidence preponderates in favor of finding that her shoulder pain began no sooner than January 1, 2015, more than two months after an October 23, 2014 influenza ("flu") vaccination.

### Procedural History

Ms. Akintaju's petition alleges that she received the flu vaccination. Petition, filed October 20, 2017. The petition does not identify any specific injury that the flu vaccination might have caused. The petition, however, does refer to

---

[*] The parties were informed that this Finding of Fact would be made available to the public. Ms. Akintaju sought redaction of this Finding, but her motion was denied. Order, issued Apr. 23, 2021. Accordingly, this order is being posted as originally submitted, except for modifications to the caption and this footnote.

two problems – first, an allergic reaction manifesting as hives, facial swelling, sneezing, watery eyes, etc. and second, shoulder pain. Petition ¶ 4. Ms. Akintaju filed records from doctors who treated her, including Dr. Mercy Obamogie and Dr. Bruce Rind.

The Secretary reviewed those records. The Secretary maintained that the medical records are not reliable due to internal inconsistencies. Resp't's Rep't, filed Sep. 7, 2018, at 11. With his report, the Secretary filed a Consent Order from the Maryland State Board of Quality Assurance in which Dr. Rind was reprimanded and placed on probation for 18 months. Dr. Rind had been charged with, among other problems, failing to keep adequate medical records. Exhibit A (In the Matter of Bruce Rind, No. 98-0507, Maryland State Board of Physician Quality Assurance, dated Dec. 20, 2000).

Ms. Akintaju developed additional evidence, including personnel files from various companies who employed her as a nurse and affidavits from coworkers. When the documentary record appeared complete, the parties set forth their positions regarding the onset of Ms. Akintaju's shoulder pain. Pet'r's Statement, filed Aug. 13, 2020; Resp't's Statement, filed Sep. 8, 2020.

Ms. Akintaju and three other witnesses testified orally at a hearing held on November 18, 2020. All participants appeared via video teleconferencing. Following the hearing, Ms. Akintaju explored the availability of other documents. She filed a VAERS report as exhibit 31. With that submission, the matter is ready for adjudication.

## Summary of Evidence

Ms. Akintaju was born in 1970. In the years before and after the October 23, 2014 vaccination, Ms. Akintaju worked in hospitals. While Ms. Akintaju worked *in* hospitals, she did not always necessarily work *for* hospitals. Ms. Akintaju sometimes worked for agencies that placed nurses in hospitals. Tr. 21.

Regardless of who technically employed Ms. Akintaju, her job duties as an intensive care unit nurse were consistent. Tr. 19-22. She was trained to create medical records electronically. She obtained histories from patients and conducted physical exams of her patients. Tr. 121-22; see also Tr. 206. Those examinations sometimes required Ms. Akintaju to touch her patients. Ms. Akintaju had to roll patients over in bed and help them sit up in bed after they slumped down. Tr. 30.

Ms. Akintaju had medical insurance throughout the relevant time. Tr. 114, 149. Ms. Akintaju's primary doctor was Dr. Obamogie. Tr. 63, 127. Ms.

Akintaju described Dr. Obamogie as a good doctor and a good listener. Tr. 128. Ms. Akintaju could obtain appointments with Dr. Obamogie easily. Id. Ms. Akintaju accepted the accuracy of Dr. Obamogie's medical records. Tr. 70, 72.

Ms. Akintaju also sought treatment from Dr. Rind, who provided naturopathic or alternative therapies to her. Tr. 38, 64, 68. She also described Dr. Rind as a good doctor and a good listener. Tr. 130.

Ms. Akintaju saw Dr. Rind on February 20, 2014, due to a history of breast lumps, chronic urinary tract infections, and moderate fatigue. Exhibit 5 at 51; Exhibit 6 at 111 (duplicate). Dr. Rind provided "about 20 minutes of IR laser over the left breast to see if this would help with drainage." Exhibit 5 at 54. Dr. Rind also recommended a "protocol." Id.

Ms. Akintaju's breast lumps were the topic of the next few medical appointments. In an April 1, 2014 appointment, Dr. Rind described Ms. Akintaju's breast lumps as shrinking. Exhibit 5 at 45-46. Ms. Akintaju also sought assistance from Dr. Obamogie for breast nodules in June 2014. Exhibit 8 at 52-53, 62. On August 14, 2014, Dr. Rind stated that Ms. Akintaju's breast lumps "may have an inflammatory/infectious origin." Exhibit 5 at 43.

In October 2014, Ms. Akintaju was working for Contemporary Nursing Solutions and was working at MedSTAR Southern Maryland Hospital. Tr. 34, 75. During an overnight shift that began on October 23, 2014, Ms. Akintaju received the flu vaccination. Exhibit 1; Exhibit 7 at 144. Ms. Akintaju recalled the person who administered the vaccination, but that person declined to testify. Tr. 133. Ms. Akintaju completed her nursing shift as scheduled. Tr. 56, 81.

On October 24, 2014, Ms. Akintaju woke up around 4:30 in the afternoon. Her face was heavy and puffy. She was coughing, sneezing and wheezing. She also had a stabbing pain in her arm. Ms. Akintaju thought she was having an allergic reaction and experiencing hives, so she took Benadryl and Claritin. Tr. 35-36, 80. Ms. Akintaju, however, did not take any pictures showing her condition. Tr. 155.

Ms. Akintaju reported for her nursing shift on October 24, 2014 as usual. Her testimony surrounding her activities vis-à-vis her apparent allergic reaction was confusing. She stated that after her initial meeting with the other nurses on her shift, she spoke with her supervisor. (Although Ms. Akintaju recalled the supervisor was a registered nurse, she did not recall the person's name.) Ms. Akintaju testified that she told the supervisor about her reaction which included a

3

swollen face. In response, the supervisor directed Ms. Akintaju to go to employee health. Tr. 37, 82-83.[1]

Ms. Akintaju testified that she filled out an "incident report." But, the director of employee health told Ms. Akintaju that the episode was not an "incident." As a result, Ms. Akintaju did not submit an incident report and she tossed it out. Tr. 52-53, 83-84. The director, according to Ms. Akintaju's testimony, instead told Ms. Akintaju to complete a VAERS report. Tr. 84. Ms. Akintaju did submit a VAERS report, but not until June 14, 2017. Exhibit 31; Tr. 85.[2]

Ms. Akintaju did not formally seek medical attention for either an allergic reaction or shoulder pain for some time. Her first appointment with a medical professional following the vaccination was on November 5, 2014, when she went to National Integrated Health Associates, where Dr. Rind works.[3]

Ms. Akintaju did not intentionally schedule the November 5, 2014 appointment because of any shoulder pain. Rather, she had scheduled this appointment in conjunction with her previous appointment for breast lumps. Tr. 134. Dr. Rind memorialized that Ms. Akintaju still had lumps in her breasts. Exhibit 5 at 39.

As part of his assessment, Dr. Rind tested Ms. Akintaju's abduction and adduction of her upper extremities. Exhibit 5 at 40; Tr. 89. Dr. Rind tested both her left side and her right side, although Ms. Akintaju was having pain on only her left side. Tr. 92. After an initial round of testing, Ms. Akintaju took olive oil extract. After approximately 3 to 5 minutes, Dr. Rind conducted a second round of

---

[1] Similarly, Ms. Akintaju testified that a doctor with whom she worked on October 24, 2014, Dr. Okang, recommended that she seek care in the emergency department. However, after Ms. Akintaju told Dr. Okang that she had already taken medication, the doctor advised that a trip to the emergency department was unnecessary because doctors there would prescribe the same medicine. Tr. 37, 80.

[2] June 14, 2017 was nearly three years after the vaccination and approximately three months before Ms. Akintaju filed her petition.

[3] During the hearing, the Secretary questioned whether Dr. Rind saw Ms. Akintaju on November 5, 2014 because Dr. Rind did not sign any of the treatment records for Ms. Akintaju on November 5, 2014. The records prepared for that date show that Michael Taylor saw Ms. Akintaju. Exhibit 5 at 39-41; Tr. 87-89. Whether Dr. Rind or his assistant Mr. Taylor saw Ms. Akintaju on November 5, 2014 appears not to affect whether Ms. Akintaju was suffering from shoulder pain on that day. Thus, this ruling assumes that Dr. Rind saw her.

4

testing for Ms. Akintaju's upper extremities. Tr. 90. Ms. Akintaju testified that Dr. Rind was checking to see if mold was causing any problems in her breasts. Tr. 90; see also exhibit 5 at 40 (Dr. Rind: olive oil extract has an "anti-mold toxin effect").

After Dr. Rind completed the testing for abduction and adduction, Ms. Akintaju told Dr. Rind that she was having pain in her left arm. Tr. 91-92; Pet'r's Statement, filed Aug. 13, 2020. Ms. Akintaju testified that Dr. Rind looked at her left arm and could pinpoint the painful area. Tr. 40. She testified that initially her pain was about a 5/10. Then, Dr. Rind poked it and the pain was so intense that she wept and cried. She scored the pain after Dr. Rind pressed on her shoulder as a 10. Tr. 40-43, 92-93.

Ms. Akintaju further testified that after Dr. Rind poked her shoulder to cause her to cry, he told Ms. Akintaju that we need to document it. He also told Ms. Akintaju that she should not get another flu shot. Tr. 44, 155. While Dr. Rind seemed to find how Ms. Akintaju responded to his physical examination of her shoulder significant, he did not document any her complaint about shoulder pain, his examination of her shoulder, or her response to the examination in his medical record from that date. Tr. 94; see also exhibit 5 at 39-41; exhibit 6 at 98-100.

Ms. Akintaju also testified that to care for her shoulder pain on November 5, 2014, Dr. Rind recommended laser treatment. He used the laser on her and said she could return for more treatments. Tr. 95. Again however, Dr. Rind's treatment record from November 5, 2014 does not reflect any laser treatment.

Following the November 5, 2014 appointment with Dr. Rind, Ms. Akintaju continued to work at her nursing job. She did not reduce the number of shifts she worked, despite her fatigue. Tr. 55. One witness, Dorcas Akala, stated that after the vaccination Ms. Akintaju's job performance seemed the same. Tr. 179. Ms. Akintaju testified that she was able to work through pain, "just bear[ing] it." Tr. 169. Ms. Akintaju also stated that while she did not miss any shifts, she also refrained from adding additional shifts. Tr. 170. But see Tr. 26 (Ms. Akintaju's testimony that before the vaccination she did not work overtime, but sometimes stayed late to cover for a nurse who was running late).

Ms. Akintaju's next medical appointment was with Dr. Rind on December 3, 2014. The reason for the appointment was her breast lumps. Exhibit 5 at 32.

According to her testimony, she was having shoulder pain, but she did not ask Dr. Rind to examine her shoulder. Tr. 97-98. In a statement prepared for the

5

hearing, Ms. Akintaju rated her pain as a three and she was having sharp pain with some tingling. Ms. Akintaju also testified that she told Dr. Rind that the laser treatment helped to reduce her pain. Tr. 98. But the medical record from December 3, 2014 do not memorialize any complaints about shoulder pain or successful treatment with a laser. See exhibit 5 at 32-35; exhibit 6 at 98-100.

Ms. Akintaju returned to her primary care doctor, Dr. Obamogie, on December 31, 2014, complaining of pink eye. Exhibit 8 at 48-49; Tr. 100-01. Dr. Obamogie prescribed medications for the conjunctivitis. Id.

Ms. Akintaju testified that on December 31, 2014, she told Dr. Obamogie that the conjunctivitis was connected to the vaccine, she had an allergic reaction back in October, and that she had been having arm pain since the vaccination. Tr. 45, 100-02. Dr. Obamogie's medical record does not reflect any of these complaints on December 31, 2014. See exhibit 8 at 48-49.

Ms. Akintaju averred that around the time she saw Dr. Obamogie on December 31, 2014, she had not reduced any hours at work. Tr. 136-37. At home, she was limited in her abilities to do some tasks such as washing plates. Id.

Approximately one month later, to check on the resolution of the pink eye, Ms. Akintaju had another appointment with Dr. Obamogie. Exhibit 8 at 46 (January 28, 2015). Dr. Obamogie memorialized that Ms. Akintaju told her she was having left arm muscle pain after the flu shot. Id. Ms. Akintaju testified that Dr. Obamogie recorded her complaint about muscle pain. Tr. 45. Ms. Akintaju, accordingly, believes that this medical record is accurate. Tr. 46-47. The record also memorializes that Ms. Akintaju was having problems in her left wrist and right knee. Exhibit 8 at 46-47. Dr. Obamogie referred Ms. Akintaju to a rheumatologist.

Ms. Akintaju had the appointment with a rheumatologist, Maria Chou, on February 3, 2015. Exhibit 3 at 2-5. Dr. Chou recorded that Ms. Akintaju was having "persistent soreness of the upper arm after flu shot in October." She also noted that Ms. Akintaju had a "three-month history of left arm pain after flu vaccine." Id. at 5. X-rays for her left wrist and left shoulder were normal. Exhibit 4 at 3-4. Dr. Chou's examination of Ms. Akintaju's left shoulder revealed "no tenderness to palpation, no pain, normal range of motion." Exhibit 3 at 4. Dr. Chou recommended Ms. Akintaju take Motrin and perform a range of motion exercises. Dr. Chou requested that Ms. Akintaju return in six weeks. Exhibit 3 at 5; Tr. 104-05, 142. Ms. Akintaju testified that she did the exercises for at least two

6

months and the exercises loosened up her shoulder and reduced the pain. Tr. 143-44.

About one week later, Ms. Akintaju again saw Dr. Rind. The reasons for the appointment were breast lumps and left arm pain. The history that Dr. Rind obtained stated that Ms. Akintaju "immediately developed pain in the left deltoid where the shot was given. This pain spread down the arm and to the left face which was intense. 3 weeks later she developed congestion and conjunctivitis, affecting her sleep." Exhibit 5 at 26.

After a physical examination, Dr. Rind stated that Ms. Akintaju had "left arm tenderness." Id. at 27. "Light pressure with [Dr. Rind's] finger over this spot [was] so painful to her that it brought tears to her eyes." Id. at 28. Dr. Rind treated her left deltoid with a laser. Exhibit 5 at 28; Exhibit 6 at 100.

Dr. Rind commented that her adverse reaction to the flu vaccine was "serious, almost career ending." Exhibit 5 at 28; accord Tr. 49. During her oral testimony, Ms. Akintaju could not explain why Dr. Rind had described her injury as "almost career ending." When she had seen Dr. Rind, Ms. Akintaju had not missed any shifts at work. Tr. 144-45.

Ms. Akintaju, similarly, did not understand why Dr. Rind's February 10, 2015 medical record referred to laser treatment when, according to her testimony, she had gotten treatment with a laser on November 5, 2014. Ms. Akintaju appeared adamant that she received laser treatment only once. In Ms. Akintaju's recollection, Dr. Rind did not charge her for the first laser treatment, but any additional treatments would have been too expensive. Tr. 145-47.

Ms. Akintaju indicated in her testimony that she was still having shoulder pain in March 2015. Tr. 148. However, in March 2015, which was approximately six weeks after the February 3, 2015 appointment with Dr. Chou, Ms. Akintaju did not seek any follow-up medical attention. Id.

Ms. Akintaju attested that her pain subsided gradually. By approximately July 2015, she was no longer having pain in her left shoulder. Tr. 50, 150.

Dr. Rind saw Ms. Akintaju for a problem with her left breast on July 23, 2015. This record does not suggest that Ms. Akintaju was experiencing pain in her left shoulder. Exhibit 6 at 125.

7

Ms. Akintaju saw Dr. Obamogie for a routine health maintenance visit on August 18, 2015. This record also does not present any concerns about a left shoulder problem. Exhibit 8 at 44.

Dr. Rind wrote his first "To Whom It May Concern" letter on August 20, 2015. Dr. Rind said that in October 2014, Ms. Akintaju had a "serious reaction" to the flu vaccine. He recommended that she not receive any doses in the future. Exhibit 6 at 16.

Dr. Rind wrote a second and lengthier "To Whom It May Concern" letter on December 14, 2015. Exhibit 6 at 15. In this letter, Dr. Rind described hives and swelling on Ms. Akintaju's face. Dr. Rind also recounted a progression of soreness and pain, starting in her left shoulder. He again stated that she should not receive flu vaccines in the future. Id.; accord Tr. 61.

At some unspecified date, Ms. Akintaju modified her employment. She stopped working as an agency nurse and began working directly for a hospital. Tr. 13. In April 2020, she entirely stopped working due to dizziness. Her decision to stop working was not because she was suffering from Corona virus. Tr. 16-17, 107.

When she testified on November 18, 2020, she was not having any pain currently. Tr. 62.

## Standards for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

8

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the patient's medical issues. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people see a doctor, they report all their problems to the doctor. Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete. A notable example is Cucuras in which petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination. Cucuras, 993 F.3d at 1527. A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred." Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (Fed. Cl. 2010) (stating "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating "The special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete. To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

When weighing divergent pieces of evidence, special masters usually find contemporaneously written medical records to be more significant than oral testimony. Cucuras, 993 F.2d at 1528. Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate. Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993). However, compelling oral testimony may be more persuasive than written records. Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is

10

much less significant than a reference which negates the existence of the condition or circumstance.") (citation omitted), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

## Analysis

Pursuant to Cucuras, special masters may start with medical records created contemporaneously with the events being described in the medical records. Here, the record created closest in time to the October 23, 2014 vaccination is Dr. Rind's November 5, 2014 record. Exhibit 5 at 39. This record says nothing about shoulder or arm pain.

Ms. Akintaju's account about the November 5, 2014 visit lacks credibility. In her version, Dr. Rind caused her to cry out in pain, but he neglected to memorialize this response. She adds that Dr. Rind treated her with a laser successfully, but he failed to document this medical intervention. This version of events is unlikely to be accurate. It is more likely that Ms. Akintaju did not complain about shoulder pain to Dr. Rind because she was not experiencing shoulder pain on November 5, 2014.

The finding that Ms. Akintaju was not experiencing shoulder pain on November 5, 2014 is reinforced by subsequent events. Ms. Akintaju continued to work her shifts as a nurse. Her employment records do not contain any documentation of requests for accommodation or restrictions on her ability to do her job.

The next medical record, too, aligns with a finding that Ms. Akintaju was not experiencing shoulder pain. When Ms. Akintaju saw Dr. Rind on December 3, 2014, Dr. Rind did not document any problems with her left shoulder or arm. See exhibit 5 at 36.

While Dr. Rind was disciplined more than a decade earlier for deficiencies in creating medical records (exhibit A), no evidence suggests that Dr. Obamogie had a similar problem. In Dr. Obamogie's December 31, 2014 record, she also did not indicate that Ms. Akintaju was experiencing shoulder problems. See Exhibit 8 at 43-49.

Dr. Obamogie's ability to create medical records is shown in the next record, which is from January 28, 2015. In this record as well as the February 3, 2015 record from Dr. Chou and the February 10, 2015 record from Dr. Rind, the doctors memorialize statements from Ms. Akintaju that her shoulder pain began with the flu vaccination. Certainly, these three records constitute some evidence in favor of

11

a finding that Ms. Akintaju's shoulder pain started around the time of the October 23, 2014 flu vaccination. But, the records from January-February 2015 are not contemporaneous recordings of events taking place three months earlier. Therefore, they do not enjoy the presumption of accuracy afforded by Cucuras.

Dr. Rind's February 10, 2015 record illustrates a danger of uncritical acceptance of information in medical records. Dr. Rind stated that Ms. Akintaju might have suffered a "career ending" injury. Exhibit 5 at 28. However, Ms. Akintaju was fulfilling all her regular nursing shifts. In fact, Ms. Akintaju worked more than 50 shifts (each at least eight hours in duration) between the vaccination and her appointment with Dr. Rind on February 10, 2015. Exhibit 27 at 4-5; see also exhibit 18 at 1; exhibit 20 at 2; exhibit 22 at 2.

Dr. Rind's prediction about a career-ending injury turned out not to be accurate. Ms. Akintaju continued to work. She did not follow-up with Dr. Chou in March 2015. Even by her own account, her pain was more or less done by July 2015.

So, too, Dr. Rind's letters describing a vaccine-induced injury carry little weight. Exhibit 6 at 15-16. Dr. Rind's opinion rests upon on an incorrect history. When treating doctors receive erroneous information, special masters are not required to accept their records. Dobrydnev v. Sec'y of Health & Human Servs., 566 F. App'x 976 (Fed. Cir. 2014).

In determining when the shoulder pain began, the undersigned weighs most heavily the medical records created contemporaneously. The undersigned has also considered the testimony and demeanor of the witnesses. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367 (Fed. Cir. 2009).

Ms. Akintaju's testimony was neither clear nor compelling.[4] Ms. Akintaju's testimony about an incident report seems unlikely to be accurate. Supervisors at a hospital would likely instruct an employee to document any health problems due to a vaccination given in the hospital. Administrators for the hospital would want to be aware of the extent of any injury as well as how the problem arose. It seems

---

[4] Based upon her demeanor, she appeared less than forthright when discussing the ownership of the house in which she resides. She did not readily explain whether she was contributing to paying the mortgage. Tr. 115-17. This portion of her testimony diminished her credibility.

12

unlikely that supervisors would simply direct Ms. Akintaju to file a VAERS report and not confirm that Ms. Akintaju submitted a VAERS report promptly.

The existence of an incident report created around October 23, 2014 could have established, by a preponderance of the evidence, that Ms. Akintaju experienced a medical problem in the day or days immediately following the vaccination. But, because no incident report was presented and because the first three medical records created after the vaccination do not mention any shoulder problem, the undersigned finds Ms. Akintaju's shoulder pain started much closer in time to when a doctor first memorialized a complaint about a shoulder problem.

Dr. Obamogie documented a complaint about shoulder pain on January 28, 2015. Exhibit 8 at 46. This medical record is accepted as accurate in describing Ms. Akintaju's shoulder pain on January 28, 2015. But, on December 31, 2014, Dr. Obamogie did not record any problem with shoulder pain. See exhibit 8 at 48-49. Thus, the record taken as a whole supports a finding that Ms. Akintaju's shoulder pain began after December 31, 2014 and before January 28, 2015. Ms. Akintaju's shoulder pain concluded before July 23, 2015.

## Conclusion

After consideration of all evidence, documentary and testimonial, the undersigned finds that Ms. Akintaju's shoulder pain after December 31, 2014 and before January 28, 2015. Ms. Akintaju shall file a status report proposing her next steps for this case in 30 days.

**IT IS SO ORDERED**.

<span style="margin-left: 50%;">s/Christian J. Moran<br>Christian J. Moran<br>Special Master</span>